## AFFIDAVIT

I, Myrick Dennis, with the Cleveland Field Office of the United States Postal Inspection Service (hereinafter "USPIS"), having first been duly sworn according to law, hereby depose and say:

## INTRODUCTION

1.      As a United States Postal Inspector, I am an investigative law enforcement officer of the United States of America within the meaning of Title 18, United States Code, Section 2510(7). I am empowered by law to conduct investigations of, and to make arrests for, offenses enumerated in Title 18, United States Code, Section 2516.

2.      I have been employed by the USPIS for approximately 3 years and assigned to the Cleveland Field Office for each of those 3 years. During this time, I have been assigned to the Prohibited Mail Narcotics team, which investigates the mailing of illegal drugs and their proceeds. I have been the case agent in multiple investigations leading to prosecution and conviction in both U.S. District Court and state courts.

3.      I have received training in the detection and investigation of prohibited mailing offenses during a 12-week residential Basic Inspector Training program in Potomac, Maryland. I have also received training in financial investigations as they relate to drug trafficking organizations, money laundering, and asset forfeiture. I have received field training and participated in many aspects of USPIS drug investigations, including but not limited to, parcel interdiction, surveillance, controlled deliveries, interview and interrogation, confidential source/cooperating witness debriefing, and interception and analysis of electronic communications. I am familiar with drug traffickers' methods of operation, especially as they relate to the Postal Service, including the storage, transportation, and distribution of drugs, the transfer and collection of money which represents the proceeds of drug trafficking, and money laundering.

4.       I know from my training and experience that drug traffickers often communicate with their drug-trafficking associates through the use of telephones, especially cellular telephones, to arrange transportation and deliveries of drugs and drug payment and/or proceeds. Drug traffickers also frequently

use coded language during telephone conversations and in text messages to disguise their communications about illegal drugs or proceeds obtained from the sale of drugs. I know drug traffickers are also often aware that law enforcement monitors telephones in an effort to identify illegal activity.

5.      I know from my training and experience that individuals engaged in organized drug distribution and sales maintain extensive and continual contact with persons throughout the United States, as well as foreign countries, from whom they receive drugs, drug proceeds, and related information. I know drug traffickers often utilize multiple cellular telephones and frequently switch their cellular telephone numbers when conducting their illicit business in order to avoid detection by law enforcement. Drug traffickers often attempt to compartmentalize their activities and electronic communications to separate devices in order to insulate various parties from each other and thwart law enforcement attempts to map out the drug trafficking conspiracy. Therefore, I am aware that the cellular telephone is typically an indispensable "tool of the trade" for drug traffickers, and drug traffickers rarely travel without their cellular telephone(s).

6.      I know from my training and experience that drug traffickers frequently attempt to conceal their identities and the locations at which their illicit activities occur through the use of real properties, vehicles, utilities, communication devices, and other items purchased and held in the names of others. Drug traffickers also often drive different vehicles to avoid being identified as driving one particular vehicle with an identifiable license plate in order to thwart investigation of their illegal activities, and the vehicles which drug traffickers use to transport controlled substances often contain traces or physical evidence of controlled substances, large amounts of cash earned from illegal drug transactions, concealed weapons, and/or communication devices such as cellular telephones.

7.      I have personally participated in and led the investigation set forth below. I am familiar with the facts and circumstances of the investigation through my personal observations, my training and experience, information obtained from other law enforcement officers, information obtained from witnesses, and my review of records and reports pertaining to this investigation. Unless otherwise noted, whenever in this affidavit I assert that a statement was made, the information was provided by another

2

law enforcement officer (who may have had either direct or hearsay knowledge of the statement) to whom I have spoken or whose report I have read and reviewed.

8.      Because this affidavit is submitted for the limited purpose of supporting a criminal complaint, I have not included each and every fact known concerning this investigation. I have set forth only the facts necessary to establish probable cause that the following defendant has distributed, and conspired to distribute, approximately 2991.09 grams of Fentanyl, a Schedule II controlled substance, in violation of Title 21 U.S.C., Sections 841(a)(1) and (b)(1)(A), and 846:

KENNETH TORRES, aka KENNETH TORRES-BORQUES, aka "FLACO"

## PROBABLE CAUSE

### Background of Investigation

9.      On January 12, 2017, postal management contacted Postal Inspectors about a suspicious parcel, identified as USPS Priority Mail parcel no. 9505 5100 5357 7010 0558 67 addressed to Ashley Young, 1410 E. 53rd, Cleveland OHIO 44103, and having a return address of Anthony Young, 210 East Flamingo Rd Unit 106, Las Vegas, NV 89159 ("subject parcel"). On this date, I retrieved the subject parcel from the Cleveland, OH 44103 Post Office and secured it at the USPIS Cleveland Field Office.

10.      Based on my training and experience, I saw that the subject parcel had characteristics—including its origin, destination, and weight—consistent with packages used for drug trafficking. I then used CLEAR, an investigative tool that provides access to multiple proprietary and public records and has proven reliable in previous investigations, and saw that both the delivery name and the return name appeared to be fictitious; that is, neither of them associated with their respective addresses. Next, I placed the subject parcel into a lineup containing several blank parcels that emanated no narcotics odors. Narcotic detection canine "Ciga," handled by Detective Twombly of the Cuyahoga County Sheriff's Department, was allowed to examine the lineup. Ciga gave a positive alert on the subject parcel and none of the blank parcels. I also witnessed this alert. According to Detective Twombly, this positive alert meant Ciga detected the odor of an illegal drug emanating from the subject parcel.

3

11.     Thereafter, I obtained and executed a federal search warrant (1:17 MJ 4002) for the subject parcel resulting in the recovery of approximately 3 kilograms of field tested positive heroin concealed inside clear plastic containers and bubble mailer envelopes. This substance was later laboratory tested and determined to be fentanyl rather than heroin. I know from my training and experience that drug traffickers often handle multiple different types of illicit drugs for which narcotic detection canines are trained, and that drug traffickers often leave the scent of these drugs on boxes, their contents, and associated packaging materials.

12.     On January 13, 2017, Postal Inspectors and Cleveland Police conducted a controlled delivery of the subject parcel, resulting in the arrest of multiple subjects.

**"FLACO" Electronic Surveillance / Las Vegas Operation**

13.     On January 17, 2017, a cooperating witness (hereinafter "CW1" and whether male or female referred to with masculine pronouns) advised me that a person named "FLACO" provided the 3 kilograms of what CW1 thought was heroin to CW1 on or about January 9, 2017, at the Flamingo Hotel and Casino (hereinafter "Flamingo") in Las Vegas, Nevada. During this meeting, "FLACO" provided him the phone number 323-812-4077[1] (hereinafter Target Telephone 1, "TT1") as his new number to use for future communications. CW1 was supposed to meet with "FLACO" at the Flamingo in the next few days to pay a partial debt for the 3 kilograms and to pay for and obtain additional kilogram quantities of heroin. CW1 described "FLACO" as a Mexican male approximately 6 feet tall, average build, approximately 30 years old, and often wearing open-toed sandals. According to CW1, "FLACO" lived in the Los Angeles area and would regularly travel to Las Vegas to party and conduct drug transactions. CW1 also stated that "FLACO" was known to drive a silver Porsche Cayenne SUV.

14.     On January 17, 2017, a second cooperating witness (hereinafter "CW2" and whether male or female referred to with masculine pronouns) also advised me that "FLACO" provided the 3

---

[1] On March 11, 2017, in response to a court order, T-Mobile USA, Inc., provided the following subscriber information for TT1: Anzel Antonio Cervantes, 15909 Vermont Ave, Paramount, CA 90723-5033; effective date 01/08/2017. CLEAR queries determined the name Anzel Antonio Cervantes to be fictitious.

4

kilograms of what CW2 thought was heroin to CW1 on or about January 9, 2017. CW2 stated he also met with "FLACO" on or about January 3, 2017, at the Excalibur Hotel and Casino in Las Vegas, Nevada, in order to obtain 2 kilograms of what CW2 thought was heroin. CW2 described "FLACO" as a Mexican male who often wore open-toed sandals.

15.     On January 17, 2017, CW1 placed a consensually monitored[2] call to "FLACO" at TT1. CW1 stated he was ready to meet again with "FLACO" and asked if he should travel to Las Vegas or if "FLACO" would travel to CW1. "FLACO" stated he was currently in Los Angeles and would call CW1 back.

16.     On January 17-18, 2017, the following consensually monitored text messages were exchanged between CW1 and "FLACO" at TT1:

| Party | Date | Time (EST) | Content |
| --- | --- | --- | --- |
| "FLACO" | 1/17/2017 | 11:49 pm | Am ready I got 2 [additional kilograms of heroin] wen are u ready to come |
| CW1 | 1/18/2017 | 1:34 pm | I'll b there monday Cool? |
| "FLACO" | 1/18/2017 | 1:35 pm | Okey |

17.     On January 20, 2017, CW1 placed a consensually monitored call to "FLACO" at TT1. "FLACO" and CW1 confirmed they were each ready to meet on Monday, January 23, 2017, in Las Vegas to exchange money and 2 additional kilograms of heroin. On this same date, I served a court order on T-Mobile USA, Inc., for a pen register and trap and trace device with cell tower data (hereinafter "pen/trap") for TT1.

18.     On January 21-23, 2017, the following consensually monitored text messages were exchanged between CW1 and "FLACO" at TT1. "FLACO" informed CW1 that he had 2 additional kilograms of heroin ready and wanted to make sure CW1 was ready with payment for these and the previous kilogram of heroin that was owed to "FLACO." "FLACO" informed CW1 that he would be at the Flamingo again and would expect CW1 to arrive in Las Vegas at approximately 8:00 pm:

---

[2] Law enforcement was present for each consensually monitored call between CW1 and "FLACO."

| Party | Date | Time (EST) | Content |
|-------|------|-----------|---------|
| "FLACO" | 1/21/2017 | 7:50 pm | 2 of the cars [kilograms of heroin] ur [are] ready but ur [are] you gus [guys] ready for the 2 and the one you gus [guys] old [owed] me |
| CW1 | 1/22/2017 | 8:59 pm | Yah bro ready for the old and new ones |
| CW1 | 1/22/2017 | 9:11 pm | U still good |
| "FLACO" | 1/22/2017 | 9:12 pm | 2 morro what time. |
| "FLACO" | 1/22/2017 | 9:12 pm | Yes |
| CW1 | 1/22/2017 | 9:12 pm | Same like 8 |
| CW1 | 1/22/2017 | 9:12 pm | Ok |
| "FLACO" | 1/23/2017 | 5:01 am | Ama [I'll] be on flamingo like allways |
| CW1 | 1/23/2017 | 6:16 am | Cool |

19.     On January 23, 2017, at approximately 10:51 pm EST, pen/trap records showed a text message sent from "FLACO" to CW1. Cell tower data for TT1 indicated at this time it was located in the vicinity of the Flamingo. The message was not received until 12:26 am EST because CW1's telephone was on airplane mode until this time. (See content in table below).

20.     On January 24, 2017, at approximately 12:26 am EST, Postal Inspector Bryon Green took CW1's telephone off airplane mode, and the following consensually monitored text messages were exchanged between CW1 and "FLACO" at TT1:

| Party | Date | Time (EST) | Content |
|-------|------|-----------|---------|
| "FLACO" | 1/24/2017 | 12:26 am (received) | Are you okey OR sick? |
| CW1 | 1/24/2017 | 12:27 am | Just landed it was a delay flight |

21.     At approximately 12:28 am EST, CW1 received a call from "FLACO" at TT1 which Inspector Green listened to on speakerphone. Cell tower data for TT1 indicated at this time it was located in the vicinity of Primm, Nevada, just past the California border. "FLACO" told CW1 he had called CW1's girl, who told "FLACO" CW1 was sick. CW1 told "FLACO" he was ok and he was about to get a cab from the airport to the Flamingo.

6

22.     At approximately 12:58 am EST, CW1 placed a consensually monitored call to "FLACO" at TT1. Cell tower data for TT1 indicated at this time it was traveling north from the California border toward Las Vegas. "FLACO" told CW1 he was on the freeway 10-15 minutes away from the Flamingo. CW1 told "FLACO" he was in Las Vegas with another girl besides the one "FLACO" called, and "FLACO" almost got CW1 in trouble. "FLACO" apologized to CW1 for this. "FLACO" said he would call CW1 when "FLACO" got to the Flamingo.

23.     Beginning at approximately 1:26 am EST, the following consensually monitored text messages were exchanged between CW1 and "FLACO" at TT1:

| Party | Date | Time (EST) | Content |
|-------|------|-----------|---------|
| CW1 | 1/24/2017 | 1:26 am | How long |
| "FLACO" | 1/24/2017 | 1:27 am | Foor [floor] and numeber room |
| CW1 | 1/24/2017 | 1:27 am | Spa elevator 7033 |
| "FLACO" | 1/24/2017 | 1:28 am | What foor [floor] |
| CW1 | 1/24/2017 | 1:28 am | 7 |
| CW1 | 1/24/2017 | 1:48 am | Whats up? |
| "FLACO" | 1/24/2017 | 1:49 am | On my way |

24.     At approximately 1:49 am EST, cell tower data for TT1 indicated it was located in the vicinity of the Flamingo.

25.     At approximately 2:41 am EST, cell tower data for TT1 indicated it was still located in the vicinity of the Flamingo.

26.     At approximately 2:58 am EST, CW1 attempted a consensually monitored call to "FLACO" at TT1 that went straight to voicemail. Due to "FLACO's" telephone being powered off, the operation was suspended until later that morning.

27.     At approximately 11:00 am EST, CW1 attempted another consensually monitored call to "FLACO" at TT1 that went straight to voicemail. Due to "FLACO's" telephone remaining powered off, the operation was terminated.

28.     On February 1, 2017, the USPIS Forensic Laboratory confirmed the controlled substance seized from the subject parcel contained fentanyl weighing a total of 2991.09 grams.

**Cellular Telephone Analysis**

29.     On February 2, 2017, I reviewed pen/trap records for TT1 and identified multiple calls and text messages during the period January 20, 2017, through January 24, 2017, between TT1 and telephone number 323-926-2299. I then queried this number in CLEAR and learned of an association between this number and 2585 Iowa Avenue, South Gate, California 90280 (hereinafter "Iowa Residence"). Additional CLEAR queries showed an association between the Iowa Residence and a female subject named Jassel Valenzuela. Cell tower data for TT1 indicated it was located in the vicinity of the Iowa Residence on January 24, 2017, after the attempted Las Vegas operation targeting "FLACO." For these reasons, it was suspected that "FLACO" had an association with Valenzuela and/or the Iowa Residence.

30.     On February 14, 2017, I served a court order on T-Mobile USA, Inc., for additional records associated with TT1. Upon review, I noted additional calls and text messages during the period January 12, 2017, through January 20, 2017, between TT1 and the same telephone number (323-926-2299) linked to the Iowa Residence as noted in Paragraph 29 above. Cell tower data for TT1 indicated it was located in the vicinity of the Iowa Residence at various times during this period. Additionally, cell tower data for TT1 indicated it was located in the vicinity of 15909 Vermont Avenue, Paramount, California 90723[3] at various times during this period.

31.     On February 16, 2017, I served a court order on AT&T for records associated with cellular telephone number 310-868-4066 (hereinafter Target Telephone 2, "TT2"), which CW1 previously identified as the old number "FLACO" used to communicate with CW1 during their transaction of the 3 kilograms of fentanyl at the Flamingo in Las Vegas on or about January 9, 2017.

32.     On February 19, 2017, I reviewed the AT&T records associated with TT2 and identified multiple calls and text messages during the period January 2, 2017, through January 9, 2017, between TT2 and CW1. Many of these communications took place while TT2 was located in the vicinity of the

---

[3] This is the address listed on the subscriber information for TT1 as noted in Footnote 1 above.

Flamingo in Las Vegas, including the last few communications leading up to the meeting between "FLACO" and CW1 on January 9, 2017. I also identified multiple calls and text messages between TT2 and the same telephone number (323-926-2299) linked to the Iowa Residence as noted in Paragraphs 29 and 30 above. Cell tower data for TT2 indicated it was located in the vicinities of the Iowa Residence and 15909 Vermont Avenue, Paramount, California 90723 at various times during the period January 2, 2017, through January 9, 2017.

### TORRES Identification

33.     On March 22, 2017, Postal Inspector Wilford Claiborne of the USPIS Los Angeles Division queried the Los Angeles Regional Criminal Information Clearinghouse, a Southern California-based intelligence and deconfliction platform, and learned of an association between the Iowa Residence and KENNETH TORRES aka KENNETH TORRES-BORQUES. Inspector Claiborne learned from the Los Angeles County Sheriff's Department that a search warrant was executed on the Iowa Residence in 2014. Based on this search warrant, another search warrant was executed at an additional location, resulting in the arrest of TORRES on drug and weapon charges. TORRES was subsequently released on bail and presently has an outstanding capias warrant for this case. Inspector Claiborne provided me TORRES's identifying information and a California jail booking photo. I conducted a criminal history inquiry and learned that TORRES was also arrested in 2012 for possession of a controlled substance and in 2012, 2011, and 2009 for being an inadmissible alien.

34.     On March 22, 2017, I identified a Facebook account under the name "Yanii Hernandez" that appeared to be owned by Valenzuela. This account listed the owner's education at South Gate High School, the owner's place of origin as Culiacán, Sinaloa, Mexico, and the owner's name pronunciation as "YAH-nee JA-sel-VA-len-ZWAY-luh." This account contained multiple photos of Valenzuela, the Iowa Residence, Las Vegas (including the Excalibur Hotel & Casino), a silver Porsche Cayenne, and an Hispanic male suspected to be "FLACO" who also strongly resembled TORRES. This Hispanic male matched the physical description previously given by CW1 and CW2 and was pictured wearing open-toed sandals in multiple photos. Additionally, the following photos were posted on June 27, 2016, the day after

9

TORRES's birthday of June 26: (1) a cake resembling a bikini-clad woman's torso  with the text "Felicidades Flaco" ("Congratulations, Flaco" or "Happy Birthday, Flaco"), (2) Valenzuela and the Hispanic male resembling TORRES holding up a giant whisky bottle piñata in the driveway of what appears to be the Iowa Residence, and (3) approximately 10 Hispanic males, including the one resembling TORRES, posing with drinks and musical instruments in what appears to be the garage of the Iowa Residence.

35.     On April 4, 2017, CW2 positively identified "FLACO" as KENNETH TORRES via photo lineup.

36.     On April 11, 2017, Inspector Claiborne notified me that surveillance units had observed TORRES enter and exit the Iowa Residence multiple times on April 10, 2017.

37.     On May 3, 2017, CW1 positively identified "FLACO" as KENNETH TORRES via photo lineup.

38.     Based upon the information contained in this affidavit, I submit there is probable cause to believe that KENNETH TORRES, aka KENNETH TORRES-BORQUES, aka "FLACO" has distributed, and conspired to distribute, approximately 2991.09 grams of Fentanyl, a Schedule II controlled substance, in violation of Title 21 U.S.C., Sections 841(a)(1) and (b)(1)(A), and 846.

MYRICK DENNIS
U.S. POSTAL INSPECTOR
U.S. POSTAL INSPECTION SERVICE

This affidavit was sworn to by the affiant, who did no more than attest to its contents pursuant to Crim. R. 4.1(b)(2)(A), by telephone after a PDF was transmitted by email, per Crim R. 4.1

Thomas M. Parker, United States Magistrate Judge
at Cleveland, Ohio
**Dated:**
11:44 AM, Jun 5, 2017

10